# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| MOMENTUM EMS INC., | § |
| | § |
| *Plaintiff,* | § |
| | § |
| v. | § |
| | § |
| KATHLEEN SEBELIUS, Secretary of | § |
| the United States Department of Health | § |
| and Human Services, | § |
| | § |
| *Defendant.* | § |

CIVIL ACTION NO. 4:11-cv-298

## MEMORANDUM AND RECOMMENDATION

Plaintiff, Momentum EMS, Inc., seeks review of a final decision by the United States Department of Health and Human Services ("DHHS"). (Dkt. 1). The case has been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(B) and the Cost and Delay Reduction Plan under the Civil Justice Reform Act (Dkt. 12). Both Momentum and DHHS have filed motions seeking final summary judgment in their favor. (Dkt. 8 and Dkt. 11).[1] After a careful review of the pleadings, the record before the Court, and the arguments presented by the parties during an oral hearing, the Court recommends that Momentum's Motion for Summary Judgment be **DENIED** and DHHS's Cross-Motion for Summary Judgment be **GRANTED**.

---

[1] The record and briefing in this case are voluminous. Momentum's Motion for Summary Judgment was 44 pages and needed two separate electronic entries on CM-ECF to be filed. DHHS's Cross-Motion was 45 pages. Each side filed a 25-page response to the other's briefing. Additionally, the record includes transcripts of three separate hearings, as well as documentation relating to at least 15 patients whom Momentum transported by ambulance.

## BACKGROUND

Momentum provides non-emergency ambulance transportation services, to and from dialysis centers, for suffering patients from renal failure.  Many of the patients whom Momentum transports are Medicare beneficiaries suffering from numerous serious medical conditions, and many are elderly and frail.

DHHS administers Medicare through the Centers for Medicare and Medicaid Services ("CMS").  In administering Medicare, CMS delegates its authority to pay, audit and review claims submitted by service providers such as Momentum to private corporations.  TrailBlazer Health Enterprises, L.L.C. ("TrailBlazer") was the entity authorized to initially pay or deny the Medicare claims Momentum submitted.  TriCenturion, a second corporation, was a Program Safeguard Contractor ("PSC") who was tasked with auditing submitted claims to ensure that all claims paid by TrailBlazer satisfied Medicare's requirements.

In 2007, TriCenturion audited approximately 6,053 claims that Momentum had submitted to Medicare.  TriCenturion selected a random sample of 30 claims, covering services rendered to 17 Medicare patients between the dates of January 1, 2005 and February 28, 2007.  This sample of 30 claims was made up of 98 individual line items, billing Medicare a total of $ 9,913.02.  TriCenturion found that 100% of these audited claims did not satisfy Medicare's requirements for payment and should not have been paid by Medicare. Extrapolating this error rate to Momentum's entire billing history, and factoring in a 90% confidence level, TriCenturion found that Momentum had received $1,741,980.18 in overpayments.

Momentum then sought review from Q2Administrators ("Q2"), another Medicare contractor. Q2 reversed TrailBlazer's findings for 10 of the 30 denied claims, and found that another claim was partially payable, but it agreed that the remainder of the 19 claims were overpayments that Momentum should not have received. Due to these new findings, Q2 found that the actual overpayment amount for the sample claims should have been reduced to $ 5,518.71. Although it reversed a large proportion of TrailBlazer's findings on individual services rendered, Q2 also found that TrailBlazer's methodology in reviewing the claims was proper. Q2 recommended that the case be returned to TrailBlazer to "determine the revised projected overpayment amount."[2]

### *ALJ Hearings*

Momentum sought an in-person hearing to contest Q2's findings before Administrative Law Judge ("ALJ") Lauren Heard. Before the hearing took place, Momentum requested ALJ Heard issue subpoenas for the medical records of the Medicare beneficiaries who made up the audit sample. The ALJ denied this request on the grounds that "a subpoena [was] not warranted for a full presentation of the appellant's case." The ALJ also noted that Momentum could obtain this evidence directly from the patients' health care providers.

---

[2] According to Momentum, TrailBlazer then hired Health Integrity to re-extrapolate the overpayment amount based on Q2's findings. Momentum alleges that Health Integrity used Q2's findings to estimate that Momentum had received $900,000 in overpayments. Health Integrity allegedly informed Momentum of this recalculation by letter. Although such a letter is referred to in exhibits and briefing, this recalculation does not appear in the administrative record before this Court. Similarly, it was not addressed by the ALJ or MAC and it therefore does not constitute a final determination that may be addressed by the Court in this case.

The hearing before the ALJ was originally set for August 24, 2009, but was rescheduled.  In spite of Momentum's request for an in-person hearing, telephonic hearings were then set for September 9, 2009 (to address medical evidence) and September 23, 2009 (to address statistical evidence).  Momentum again requested an in-person hearing for both portions and objected to the hearings taking place by telephone.  The ALJ overruled the objection, finding that a hearing by telephone or video-teleconference "allows for a full presentation of the evidence."  Nonetheless, on September 3, 2009, as "an accommodation," the ALJ granted Momentum permission to appear in-person at the September 9 and September 23 hearings.  Momentum declined to do so, and the hearings took place telephonically.

Momentum was represented by counsel at both hearings.  Neither the Secretary nor CMS intervened in the ALJ proceeding.  Terrence Bailey, Momentum's owner, and Valesca Adams, a registered nurse, appeared and testified on Momentum's behalf at the hearing on September 9 regarding the medical necessity of ambulance transport for the patients at issue.  On September 23, Dr. Robert Bardwell gave expert testimony for Momentum and Dr. Greg Dobbins, Chief Statistician for TriCenturion's successor, Health Integrity, testified at the request of the ALJ regarding the statistical sampling and extrapolation performed during the initial audit.

### *ALJ's Decision*

On November 2, 2009 ALJ Lauren Heard issued a "partially favorable" decision. ALJ Heard addressed whether (1) "the services [Momentum provided to Medicare beneficiaries] are excluded from coverage . . . because the services were not reasonable

4

and necessary for the diagnosis or treatment"; (2) "whether the liability of [Momentum] may be waived pursuant to Section 1879 of the [Social Security Act]"; and (3) whether the determination of overpayment demand amount was based upon a statistically valid random sampling methodology and met the requirements of Medicare regulations.  (Dkt. 6-1, pg. 71).

After reviewing all of the evidence in the record, the ALJ first determined that "the sampling methodology at issue in this case was valid and could be re-created."  (Dkt. 6-1, pg. 78).  Further, the ALJ found that "some of the line items in the claims included in the sample were medically reasonable and necessary; however, other line items were incorrectly found fully favorable at the lower levels and have either been down coded or disallowed by the undersigned."  Consequently, the ALJ ordered that "the carrier must **_RE-EXTRAPOLATE_** the overpayment to the universe based on the new findings of the ALJ."  (_Id._) (emphasis in original).

Next, the ALJ reviewed Momentum's complaints about the statistical sample, and found that the sample methodology was valid.  The ALJ noted that the PSC utilized the lower limit of the 90% confidence interval, "mean[ing] that the PSC was at least 90% certain that the requested amount to be repaid was less than the actual overpayment."  (_Id._).  The ALJ also noted that the sample could be reproduced and was randomly generated.

Finally, the ALJ instructed Momentum and the Medicare contractors to refer to her individual analysis of each of the claim files in the sample.  The ALJ reviewed the 17 beneficiary files in the original sample, analyzing each of 98 itemized services that

Momentum billed for these 17 patients.  The ALJ issued an "unfavorable" finding as to 84 of the 98 services listed, stating that these services were not eligible for Medicare coverage.  She instructed that a new error rate was to be extrapolated based upon her findings, and a new demand amount calculated.

### *MAC Appeal*

Momentum appealed the ALJ's decision to the Medicare Appeals Council ("MAC").  Momentum asked the MAC to review 15 of the 17 beneficiaries reviewed by the ALJ.  Momentum complained of the telephonic hearing and the ALJ's refusal to issue subpoenas.  Momentum also complained that the ALJ misunderstood and misinterpreted section 410.40(d)

MAC reviewed the ALJ's decision on these 15 beneficiaries *de novo*.  42 C.F.R § 405.1008(a); 42 C.F.R § 405.1112(c).  MAC first upheld the ALJ's determination that that the services Momentum rendered to the 15 beneficiaries were not medical necessities and thus not payable by Medicare. Next, MAC upheld the ALJ's decision that TriCenturion's sampling was valid.  MAC also upheld the ALJ's refusal to order disclosure of documents from TriCenturion or TrailBlazer pertaining to the qualifications of the statisticians or nurses who conducted the audit review, as well as the ALJ's refusal to order medical information for the beneficiaries at issue.  MAC upheld the ALJ's ruling that the issuances of subpoenas was discretionary, and that Momentum had not demonstrated that such information was necessary for a presentation of its case. Similarly, MAC upheld the ALJ's decision to hold the hearings telephonically, pointing to the statutory discretion afforded the ALJ in such matters and the lack of evidence that

6

Momentum's case "entailed special or extraordinary circumstances."  Finally, although the ALJ's decision had not "clearly addressed" the issue whether Momentum was entitled to a statutory limitation or waiver of its liability, MAC decided that Momentum was not entitled to a limitation or waiver.

MAC adopted the ALJ's findings of fact and conclusions of law regarding statistical sampling and medical necessity, and modified the decision to include the analysis of Momentum's right to a statutory limitation or waiver of its liability.

### *Appeal to Federal District Court*

Momentum now seeks relief in this Court, alleging that the ALJ's decision "was not in accordance with the purpose and intent of the Medicare Act, nor is it in accordance with the law, nor is it in accordance with the evidence" and that the ALJ made errors of law and the ALJ's decision is not supported by substantial evidence. (Dkt. 1). Momentum and DHHS have filed cross-motions for summary judgment.  (Dkt. 8 and 11).

## APPLICABLE LAW

### I.     Medicare covers certain nonemergency ambulance transport services.

Medicare is a federally-funded health insurance program for the elderly and disabled, overseen by the Secretary of the DHHS. 42 U.S.C. § 1395c; *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506, 114 S.Ct. 2381 (1994).   Medicare pays for ambulance services for its beneficiaries, subject to certain limits.  The two primary limits at issue in this case are (1) that the patient's condition is serious enough that ambulance transport is "medically necessary," and (2) that the ambulance service provider maintains required documentation.

### A. "Medically Necessary"

The "general rule" for payment is that ambulance transport must be a "medical necessity." 42 C.F.R. § 410.40(d).[3] Under this "general rule," ambulance transport is a "medical necessity" only if the patient's medical condition is so severe that other types of transportation are "contraindicated." One example given in the applicable regulations and the Medicare Benefit Policy Manual ("MBPM")[4] is a patient who is "bed-confined," i.e., unable to get up from bed without assistance, unable to walk, and unable to sit in chair. *See* MBPM § 10.2.3 (cautioning that "[t]he term bed-confined is not synonymous with 'bed rest' or 'nonambulatory'"). Other examples that might "contraindicate" other forms of transportation—even if the patient is not "bed-confined"—include patients for whom ambulance transport is "medically required." *See* 42 C.F.R. § 410.40(d). This is a stringent standard, however, and even cases of severe illness or extreme fragility may not justify ambulance transport. Instead, more exigent or emergency circumstances must exist. The MBPM lists examples of patients for whom ambulance can be considered "medically required," including patients who must to be restrained to prevent injuring themselves or others; patients who are unconscious, "severely hemorrhaging," or require emergency oxygen during the trip; cases of acute respiratory or cardiac distress, or an

---

[3] As noted by the First Circuit, this is because "[c]arriage by ambulance costs substantially more than carriage by van or wheelchair car." *United States v. O'Brien*, 14 F.3d 703, 705 n.3 (1st Cir. 1994).

[4] The Fifth Circuit has acknowledged "the importance of Medicare manuals in the administration of the Medicare program, as well as how the Secretary will apply and interpret Medicare statutes and regulations." *Mississippi Care Center of Morton, L.L.C. v. Sebelius*, 449 Fed. App'x. 341, 345, 2011 WL 5050327, *2 (5th Cir. 2011).

acute stroke; patients with unset bone fractures; or patients who can only be moved by stretcher. MBPM § 20.   Even if medical personnel might believe that ambulance transport is in the patient's "best interests," Medicare will not cover ambulance trips for patients whose conditions do not rise to the level set out in the regulations. *See, e.g., U.S. v. Abdallah*, 629 F. Supp.2d 699, 721–22 (S.D. Tex. 2009) (Rosenthal, J.) (denying motion for acquittal after conspiracy conviction where defendants billed Medicare for transporting dialysis patients who, despite their severe illnesses, were nonetheless not "medically eligible" for ambulance transport).

Even when transport by other means, such as personal vehicle or wheelchair van is impractical or difficult, or wholly unavailable, Medicare will not pay for ambulance trips that are not "medically necessary."   The Medicare Benefit Policy Manual explains that, "[i]n any case in which some means of transportation other than an ambulance could be used without endangering the individual's health, whether or not such transportation is actually available, no payment may be made for ambulance service."   MBPM § 10.2.1; *see, e.g. United States v. Read*, 710 F.3d 219, 228 (5th Cir. 2012) (upholding criminal Medicare fraud conviction) (noting, "Patients who can sit in a wheelchair can travel by car or wheelchair van unless their medical condition requires ambulance transport."). The Office of Inspector General of the Department of Health and Human Services has documented its concerns over the widespread practice of billing Medicare for unnecessary ambulance transport, noting, "Our medical reviewers expressed concern that ambulance vehicles are being misused as taxis or to facilitate transfers into and out of vehicles." *Medicare Payments for Ambulance Transports*, OEI-05-02-00590 (January

2006).  Specifically addressing patients who needed assistance getting into and out of a wheelchair van, and were therefore instead provided ambulance services, the Inspector General noted that "[t]he coverage criteria . . . are clear that the need for transfer does not warrant an ambulance." *Id.*

## B. Required Documentation

Additionally, the guidelines require that service providers maintain proper documentation for each patient and each trip.  For nonemergency ambulance trips, a doctor or medical professional must issue a Physician Certification Statement ("PCS") to substantiate the need for the ambulance transport.  If the trip is a "scheduled, repetitive ambulance service," the ambulance company must, "*before* furnishing the service to the beneficiary, obtain[] a written order from the beneficiary's attending physician" certifying that the trip by ambulance is medically necessary.  42 C.F.R. § 410.40 (d)(2)(i) (emphasis added).  For nonemergency ambulance services that are "either unscheduled or that are scheduled on a nonrepetitive basis," the rule is slightly more flexible and allows certification after the trip.  42 C.F.R. § 410.40 (d)(3)(iii), (d)(3)(iv).  In either situation, the ambulance provider "must keep appropriate documentation on file," and is cautioned, "[t]he presence of the signed physician certification statement does not alone demonstrate that the ambulance transport was medically necessary.  All other program criteria must be met in order for payment to be made."  42 C.F.R. § 410.40 (d)(2)(ii); 42 C.F.R. § 410.40 (d)(3)(v).

However, even if a PCS is on file, ambulance services are not reimbursable if the particular trip at issue was not "medically necessary."  In *U.S. v. Read*, the Fifth Circuit

10

explained that "[p]ossession of a [PCS]—even one that is legitimately obtained—does not permit a provider to seek reimbursement for ambulance runs that are obviously not medically necessary." 710 F.3d 219, 228 (5th Cir. 2012) (affirming convictions for mail fraud and health care fraud arising from unnecessary ambulance services to Medicaid beneficiaries because PCS forms were merely "stock" forms); *see also U.S. v. Abdallah*, 629 F. Supp.2d 699, 704 (S.D. Tex. 2009) (Medicare reimbursement for nonemergency scheduled repetitive ambulance transport to and from dialysis required ambulance company to maintain a PCS). Similarly, without proper documentation, even trips that might have been medically necessary cannot be reimbursed. *See, e.g., United States v. Convalescent Transports*, Inc., 2007 WL 2090210, at *2 (E.D. N.C. July 19, 2007) (in False Claims Act case, regulations required a PCS for nonemergency, scheduled, repetitive ambulance services before reimbursement was proper).

## II.  Medicare payments are periodically audited by contractors and subcontractors.

Under the Medicare Integrity Program and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, the Secretary of DHHS hires contractors to perform audits ensuring that the amounts it pays out under Medicare "are reasonable and necessary." 42 C.F.R. § 421.500. During the audit process, the service provider shoulders the burden of justifying the expense it billed to Medicare. *See* HCFA Ruling 86-1 (noting, "the provider had the responsibility to know and should have known that the services furnished were not medically necessary," and "the provider assumes substantial responsibility for overpayments"). These audits often use statistical sampling

and extrapolation to determine whether a provider has overbilled Medicare and to estimate a total amount of overpayments.  DHHS has specifically approved this type of statistical sampling, noting "it is virtually impossible to examine each bill . . . in sufficient detail to assure before payment in every case that only medically necessary services have been provided." HCFA Ruling 86-1.  Such statistical sampling of past bills "creates a presumption of validity as to the amount of an overpayment which may be used as the basis for recoupment. The burden then shifts to the provider to take the next step." Ruling 86-1, at 11.

However, statistical extrapolation may not be appropriate in every case. Extrapolation may not be used to determine overpayment amounts "unless the Secretary [first] determines that . . . there is a sustained or high level of payment error." 42 U.S.C. § 1395ddd(f)(3). A determination of "sustained or high levels of payment errors" is not subject to "administrative or judicial review."  *Id.*; *see also* 42 C.F.R. § 405.926(p) ("[d]eterminations by the Secretary of sustained or high levels of payment errors are not initial determinations and are not appealable"); *Balko & Assoc. v. Sebelius*, No. 12-cv-0572, 2012 WL 6738246 (W.D. Pa. Dec. 2012) (court lacked jurisdiction to review Secretary's determination that high rate of error was present in claims submitted to Medicare).

There is a substantial amount of guidance provided regarding the audit processes. The Secretary has promulgated the Medicare Program Integrity Manual ("MPIM") to provide "guidance regarding the procedures [contractors] should follow in making the 'sustained or high level of payment error' determination." *Gentiva Healthcare Corp. v.*

12

*Sebelius*, No. 12–5179, 2013 WL 3800066 (C.A.D.C. July 23, 2013).  The MPIM also contains guidelines for performing statistical sampling once the determination of a high rate of error is made.  MPIM § 3.10.  In addition, Program Memorandum Transmittal B-01-01, effective January 8, 2001, gives further guidance on the use of statistical sampling to review submitted claims.  HFCA-Pub. 60B.

### III.   Service providers may appeal an audit to an ALJ and the Medicare Appeals Council ("MAC").

If an audit concludes that a service provider has improperly billed Medicare, the service provider may appeal that finding to an ALJ and receive a hearing.  *See* 42 U.S.C. § 1395ff(b)(1)(A), (d)(1); 42 C.F.R. § 405.1000(a).  The parties to the ALJ hearing are the service provider and the Medicare contractors who performed the audit.  42 C.F.R. § 405.1008.  An ALJ may request, "but may not require," that DHHS or its representatives participate in the proceedings.  42 C.F.R. § 405.1010.

The hearing before the ALJ may be conducted "in-person, by video-teleconference, or by telephone."  42 C.F.R. § 405.1000(b); 42 C.F.R. § 405.1020(b) (an in-person hearing should be conducted if "special or extraordinary circumstances exist.").  A party may object to a telephonic hearing in writing, and the ALJ may sustain the objection "upon a finding of good cause."

If the ALJ finds against the service provider, and finds that the provider has indeed billed for items or services that should not have been paid by Medicare, the service provider may appeal the ALJ's decision to the Medicare Appeals Council ("MAC").  42 C.F.R § 405.1130.  The MAC's decision is the final decision of the Secretary.  If the

service provider is not satisfied with the MAC's decision, it may then appeal to this Court.

## STANDARD OF REVIEW

This Court's review of the Secretary's final decision proceeds under 42 U.S.C. § 405(g). The Court is limited to determining whether the Secretary's decision is supported by substantial evidence and whether the proper legal standards were employed to evaluate the evidence. *Estate of Morris v. Shalala*, 207 F.3d 211, 215 (5th Cir. 2001). "Substantial evidence" means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 215 (5th Cir. 1996). Substantial evidence is more than a scintilla and less than a preponderance. *Villa v. Sullivan*, 895 F.2d 1019, 1021–22 (5th Cir. 1990). A finding of no substantial evidence is warranted only "where there is a conspicuous absence of credible choices or no contrary medical evidence." *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (internal quotation marks and citation omitted). The court may not re-weigh the evidence in the record, nor try the issues de novo, nor substitute the court's judgment for the Commissioner's decision. *Harrell v. Bowe*n, 862 F.2d 471, 475 (5th Cir. 1988). Further, substantial deference must be afforded to an agency's interpretation of its own regulations. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

Because both parties have moved for summary judgment, the Court proceeds under Federal Rule of Civil Procedure 56. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a

14

matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986)).

## ANALYSIS

Momentum seeks to have the ALJ's decision overturned entirely. Momentum alleges that it was deprived of due process before the ALJ. Momentum also alleges that the ALJ's decision contains legal errors and that substantial evidence does not support the ALJ's decision.[5] These arguments are addressed in detail in each of the sections below.

The Secretary seeks to have the decision below affirmed in its entirety, and asks to that summary judgment be entered in her favor.

### I.      Alleged Due Process Violations

The Court first addresses Momentum's contention that its due process rights were violated. The Court reviews these claims *de novo*. *See, e.g., North Texas Specialty Physicians v. F.T.C.*, 528 F.3d 346 n.12 (5th Cir. 2008).

### A. ALJ's Denial of Momentum's Discovery Requests

Momentum complains that the ALJ's denial of three discovery requests amounted to a violations of its due process rights. First, Momentum sought discovery of the name and qualifications of the nurse who assisted TriCenturion in the initial audit, as well as the name and qualifications of the statistician who selected the initial sample.

---

[5] Momentum's briefing is difficult to interpret. The Court has endeavored to encapsulate and address Momentum's points in "plain English," sometimes having to re-order them in a more logical fashion.

Momentum also sought the "protocols, policy and qualification requirements that [TriCenturion and TrailBlazer] set for [their] medical and statistical reviewers." Momentum alleges that the ALJ's refusal to order that DHHS or TriCenturion to provide this information violates the principles set out for expert testimony in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Second, Momentum alleges that DHHS failed to provide it with information "required by the applicable statute, and enacting regulations, to support overpayment assessments." In particular, Momentum points to the Medicare Claims Processing Manual and the Program Integrity Manual, both of which instruct contractors such as TrailBlazer and TriCenturion to provide a rationale for their determinations after an audit. Third, Momentum complains that the ALJ refused to subpoena the medical records of the patients who were part of the sample in the audit process. Momentum argues that it was prevented by federal health privacy laws from obtaining this information and that the information was crucial to Momentum's ability to defend itself. Each of Momentum's due process complaints fall short.

Momentum's complaints about its discovery requests fail to take into account the crucial fact that the ALJ's determination was based on her own, independent, *de novo* review of the bills sent to Medicare and the supporting documentation in each instance. For example, the ALJ undertook her own independent analysis of the sampling methodology at issue, finding it was valid and could be re-created. Next, the ALJ undertook her own independent review of the line items in the sampled claims, making a finding as to whether each item was payable as medically necessary. The ALJ's analysis of each of these issues was *de novo—i.e.,* in reviewing whether each ambulance trip was

16

medically necessary, the ALJ looked to the supporting documentation Momentum provided and she did not rely on TriCenturion's analysis. In light of this *de novo* review, the information Momentum sought in discovery would not have been relevant to the ALJ's analysis. For example, because the ALJ did not rely on TriCenturion's findings regarding medical necessity, the qualifications of the nurse who assisted TriCenturion would have been irrelevant to the ALJ's analysis. The same is true for Momentum's attempts to subpoena the name and qualifications of the statistician who selected the initial sample and reviewed the data and the "protocols, policy and qualification requirements" that TriCenturion and TrailBlazer set for their medical and statistical reviewers. The ALJ did not consider or rely upon TriCenturion or TrailBlazer's analysis or review of the data sampled, so the qualifications and protocols sought would have been irrelevant at the hearing.

Similarly, Momentum's contention that it should have been allowed to subpoena the medical information of the patients who made up the sampled claims fails to take into account the fact that Momentum was required to maintain adequate documentation of the medical necessity for the service rendered to that patient. Accordingly, information about these patients—gathered long after the service was rendered and billed—would not have been relevant to the ALJ's determination as to whether Momentum complied with Medicare regulations at the time of service.

### B. ALJ's Statistical Analysis

Next, Momentum alleges that DHHS and the ALJ applied a "grossly distorted statistical analysis" that amounted to a deprivation of due process. Momentum first

contends that Dr. Dobbins, who testified in defense of the statistical sampling at the hearing, admitted that the contractors who performed the audits "did not have a formula for treating statistical outliers." Momentum contends that one of the beneficiaries who made up the sample was an admitted "statistical outlier" and this invalidated the entire analysis. Similarly, Momentum argues that the sample's "skewness" and "kurtosis" were improper, and that the statistical frame from which the sample was selected was also flawed. Further, Momentum contends that the ALJ "clearly abused her discretion by ignoring Momentum's criticism of the lack of controls and quality control employed by the [contractors performing the audit] to insure [sic] not only that the statistical calculations were valid but also to ensure that data was properly analyzed and maintained." Momentum complains that the contractors (1) failed to track their own error rates; (2) failed to provide information regarding the identity of the reviewer and qualifications of the person who performed the calculations; and (3) demonstrated "innate bias."

Momentum's contentions do not warrant summary judgment in its favor. "[I]t is undisputed that the Secretary may utilize statistical extrapolation to determine the amount of overpayment and that the [Medicare Integrity Program Manual] permits the use of stratified sampling." *Miniet v. Sebelius*, No. 10-24127-CIV, 2012 WL 2930746, *6 (S.D. Fla. July 18, 2012). Further, "the sampling utilized need not be based on the most precise methodology, just a valid methodology." *Id.* "Moreover, there is a presumption of validity when statistical sampling is used by the CMS contractor and, as such, the burden is on Plaintiff to establish the invalidity of the methodology during the administrative

18

review." *Id.* The MPIM describes a variety of statistical methodologies and models by which contractors may review and audit a billing history—"Because of differences in the choice of a design, the level of available resources, and the method of estimation . . . some procedures lead to higher precision (smaller confidence intervals) than other methods." MPIM, § 3.10.2. Further, the MPIM states that "failure by [contract auditors] to follow one or more of the requirements may result in review by CMS of their performance, but should not be construed as necessarily affecting the validity of the statistical sampling and/or the projection of the overpayment." MPIM, § 3.10.1.1.

Momentum's briefing on this point is cursory and fails to explain how the ALJ erred. Momentum's failure to do so is fatal, especially when considered in light of the great degree of latitude allowed in design a sampling process and the presumption in favor of the sampling's validity. For example, although Momentum uses the terms "skewness" and "kurtosis," these general concepts are not defined or analyzed in Momentum's motion or brief,[6] and there is no meaningful discussion of the specific underlying statistical analysis at issue. The ALJ found that the record contained "complete documentation of the sampling methodology used" and that Momentum's expert was able to reproduce the sample using the methodology. The ALJ addressed Momentum's argument that one of the claims in the sample was an "outlier" because it included multiple transports, but ultimately concluded that the claim's inclusion in the

---

[6] "Skewness" is the measure of symmetry in the distribution of a data set. The skewness for a normal distribution is zero. "Kurtosis" is the measure of whether the data are peaked or flat, relative to a normal distribution. *See, e.g.,* NIST/SEMATECH e-Handbook of Statistical Methods § 1.3.5.11, *available at* http://www.itl.nist.gov/div898/handbook/, updated April 1, 2012.

sample did not invalidate the methodology. Momentum has failed to overcome the presumption of validity in the statistical method used.

### C. Alleged Denial of In-Person Hearing and Transcript Problems

Finally, Momentum complains that it was denied the right to confront witnesses and present evidence directly to the ALJ. Momentum contends that the transcript of the ALJ hearing reflects serious gaps in the transcript due to some technical difficulties the ALJ and court reporter encountered during the telephonic hearing. It is true that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (internal quotation omitted). A review of the transcripts at issue, however, demonstrates that Momentum's contentions are without merit.

First, the Court notes that Momentum was indeed given the opportunity to appear in person at the September 9th or September 23rd hearings, but that it declined to do so. Momentum alleges that the right to appear in person was merely illusory and "an accommodation in name only" because the ALJ did not grant Momentum this right until September 3, 2009. Momentum complains that it was therefore only given "four or five days to make plane and hotel reservations for its representatives and experts," and that the period of time included Labor Day weekend. However, Momentum does not cite any case law to support its contention that due process mandates at least four days' notice to make travel arrangements for three people. Further, Momentum's complaints still fail to explain why it did not attend the September 23rd hearing in person.

In addition, Momentum cannot point to any particular evidence that it believes was presented at the hearing but is not in the record. Instead, Momentum's briefing merely asserts global complaints about the telephonic hearing process as a whole. The transcript shows that court reporter's main difficulty occurred during the September 9, 2009 hearing, and that on several occasions during that hearing Momentum's counsel and witnesses apparently leaned away from their telephone receiver when testifying. The transcript therefore has the word "(indiscernible)" a various points where the transcriber could not hear or understand a word or phrase. However, the transcript in its entirety reflects that the ALJ could evidently hear the testimony because she asked particularized follow-up questions of both witnesses and counsel over the course of several hours of testimony. The record does show a handful of occasions when the ALJ asked a witness or Momentum's counsel to lean closer to the telephone, or to repeat a statement. On each occasion, the witness or counsel complied and then repeated the previous statement. Accordingly, there is no indication that the ALJ was not able to hear the full body of evidence offered by Momentum, and any stray omissions in the transcription of the testimony by the court reporter do not amount to a due process violation under these facts.

The Court points out that even an in-person hearing is no guarantee of a perfectly transcribed record. *See, e.g., Fields v. Thaler*, 588 F.3d 270, 275 (5th Cir. 2009) (concluding that the court reporter must have mistakenly attributed juror's responses during voir dire to the wrong person, noting "the transcript contains numerous other errors"); *U.S. v. Alfred*, 9 F.3d 1547 (5th Cir. 1993) (court reporter made mistake in

transcribing district court's ruling on admission of exhibits); *U.S. v. Renton*, 700 F.2d 154, 157 (5th Cir. 1983) (court reporter died shortly after appeal was filed, and substitute court reporter was unable to completely reconstruct the transcript but instead produced a transcript with "gaps due to lost or indecipherable notes and tapes"); *see also Rusu v. INS*, 296 F.3d 316, 319, 324 (4th Cir. 2002) (video conference hearing satisfied the due process requirement and provided the petitioner with an "opportunity to be heard at a meaningful time and in a meaningful manner," even though the three-hour hearing "was plagued by communication problems."). Momentum's complaints do not rise to these levels, and Momentum has not shown that it was deprived of its due process rights in this case.

## II.   Alleged Errors of Law by the ALJ

Momentum also argues that the ALJ committed multiple errors of law and failed to correctly interpret and apply the applicable statues. As noted above, an agency's interpretation of its own regulations is entitled to substantial deference. *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

### A. Medical Necessity for Nonemergency Routine Trips

Momentum first argues that the ALJ improperly interpreted the governing regulations regarding the certification of medical necessity for nonemergency, scheduled repetitive transports. Momentum contends that a physician statement of medical necessity, or a PCS, is sufficient in and of itself to justify the transports. Accordingly, it argues it should be compensated for the nonemergency routine trips for which obtained signed physician's orders had been obtained. Momentum also argues that the ALJ erred

by requiring a physician certification statement for each date of service. These arguments are without merit.

The ALJ's decision stated that "the undersigned evaluated each relevant claim in the sample for proof of medical necessity." Even where a certificate of medical necessity is on file for a patient, that form must still be able to withstand scrutiny, and the service provider must demonstrate the medical necessity of the service rendered. *See, e.g., U.S. v. Read*, 710 F.3d 219, 228 (5th Cir. 2012) ("Possession of a [PCS]—even one that is legitimately obtained—does not permit a provider to seek reimbursement for ambulance runs that are obviously not medically necessary."). In other words, evidence that Momentum had a PCS on file for these beneficiaries does not the end the analysis. Instead, there must next be a determination as to whether that PCS "was a timely, signed and sufficiently detailed physician's certificate for each of the claims appealed." *First Call Ambulance Service, Inc. v. Department of Health and Human Services*, 2012 WL 769617, *6 (M.D. Tenn. March 8, 2012); *see also Moorecare Ambulance Service, LLC. v. Department of Health and Human Services*, No. 1:09–0078, 2011 WL 2682987, *7 (M.D. Tenn. July 11, 2011) (noting that, even when a PCS states that ambulance transport is "medically necessary," such statements are not "gospel" and the other statutory requirements of section 410.40 must still be satisfied). The ALJ's application of these standards is entitled to substantial deference and was not erroneous.

### B. Improper Extrapolation of Error Rate

Momentum next alleges that ALJ violated the Medicare Modernization Act by ordering re-extrapolation. Momentum contends that re-extrapolation, as ordered by the

ALJ, is not proper because that extrapolation should only occur upon a finding of a "high level of payment error." 42 U.S.C. § 1395ddd(f)(3). Momentum contends that initial findings made by TriCenturion that supported the original finding of a high rate of error have been now called into question, and it contends that the ALJ should have made a new error rate finding because she reached different conclusions regarding the medical necessity of some of the claims than the contractors below. However, the statutory language is clear. Once a determination of a high rate of error has been made, that finding is not subject to review by this Court. 42 C.F.R. § 405.926(p) ("[d]eterminations by the Secretary of sustained or high levels of payment errors are not initial determinations and are not appealable"). "[W]hether that [rate of error] determination was made at the appropriate time is immaterial to this Court's jurisdiction to adjudicate [the] high error rate argument. The language of the statute is unambiguous . . . ." *Balko & Assoc. v. Sebelius*, No. 12-cv-0572, 2012 WL 6738246, *7 (W.D. Pa. Dec. 2012) (finding it lacked jurisdiction to consider the Secretary's determination in that case of a high rate of error in claims, further noting that the use of extrapolation was not a "sanction" but "merely permits a contractor to use a particular method of calculation in determining an overpayment amount.").

### C. Timeliness of Audit

Next, Momentum challenges the timeliness of the audit performed by DHHS contractors, and alleges that DHHS is barred from reopening claims that are more than one year old. Momentum relies on 42 C.F.R. § 405.980, which states that claims may

only be reopened within one year of the date of the initial payment determination, or within four years if "good cause" exists.

Momentum's argument does not tell the entire story—under the regulations, an initial payment decision may be reopened by the same entity that issued it "[w]ithin 12 months from the date of the notice" of that payment decision, or if good cause is shown, after those 12 months "but within 4 years" of the decision. 42 C.F.R. § 405.841(a)(b) (2007). However, when evidence of fraud or *"similar fault"* exists, a claim may be reopened for review at any time. 42 C.F.R. § 405.841(c) (emphasis added). The regulations also distinguish between a "reopening", *i.e.,* "a remedial action taken to change a binding determination," and a "consideration of a claim under appeal." 42 C.F.R. § 405.980(a)(4). Momentum does not pay any heed to that distinction, nor does it acknowledge that "[t]he contractor's, QIC's, ALJ's, or MAC's decision on whether to reopen is binding and not subject to appeal." *Id.* § 405.980(a)(5).

Similarly, Momentum's briefing fails to provide this Court with any record citations showing when each of the 98 line items at issue received a "payment decision" that would have started the clock running. A party seeking summary judgment in its favor shoulders the burden of "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A). Momentum has wholly failed to do so.

### D. ALJ's Review of Claims not Appealed by Momentum

Next, Momentum complains that the ALJ erred by addressing trips that Q2 had already determined were not overpayments. Momentum contends that the ALJ should have only addressed the trips that Momentum put at issue, and that she should not have

reached the merits of other payments that had been approved by Q2.  Momentum also contends that the ALJ erred by not deferring to Q2's determination that these charges were correct.

Momentum points the Court to 42 CFR § 405.1112(c) to support its argument on these points.  This provision, however, relates only to the scope of the MAC's review—"The MAC will limit its review of an ALJ's actions to those exceptions raised by the party in the request for review."  In contrast, the ALJ performs a *de novo* review and "issue[s] a decision based on the hearing record."  42 C.F.R. § 405.1000(d).

Momentum was reminded of the ALJ's intention to review all of the claims *de novo* during the September 9, 2009 hearing when the ALJ stated, "The regulations state that I must base my decision on the entire statistical sample, so I'll make a decision on all the claims in the sample, and when I issue a decision it will be in writing and will address each line item in each claim." (Sept. 9, 2009 hearing, pg. 2).  Momentum's counsel made no objection, and Momentum proceeded to offer testimony and documentary evidence regarding each claim.  Accordingly, the ALJ did not err by addressing claims that Q2 had previously approved and by reviewing those claims *de novo*.

### III.   Momentum alleges the ALJ's decision was not supported by substantial evidence.

Momentum next complains that the ALJ erred in deciding that many of the services for which Momentum billed Medicare were not payable.  Momentum contends that the ALJ's decision was "arbitrary and capricious" because it ignored the medical evidence in the record.  Momentum argues that the medical evidence in the record shows

that each of the claims it submitted should have been paid by Medicare and were all "medically necessary" services.   In its Motion for Summary Judgment, Momentum identifies fifteen patients whom it transported and argues that the ALJ's decision that trips for these patients were not medically necessary is not supported by substantial evidence.   Momentum's arguments on these issues spring from, in the most part, its arguments discussed above.   For example, many of Momentum's arguments relate to whether the ALJ properly determined that the ambulance service Momentum provided to a particular patient was not "medically necessary" given the patient's condition.   In light of the authorities discussed above, and the Medicare Manuals explaining these requirements, Momentum's arguments cannot be sustained.

### 1.  I. B.

Momentum transported this patient on October 2, 2006, submitted two claims for services it provided during this transport.   The ALJ determined that the ambulance transport was not shown to be "medically necessary" for I.B., and denied both claims. The ALJ noted that the evidence in the record "did not substantiate [Momentum's] claims that other means of transportation, such as a wheelchair van, were contraindicated."   In particular, the ALJ noted that I.B. could sit in a wheelchair and that he was not bed-confined. The MAC affirmed the ALJ's finding.

Momentum points to testimony that I.B. needed two medics to transfer him from his wheelchair to his stretcher, and therefore argues that I.B. could not use a wheelchair van.  Momentum also points to testimony from Nurse Adams that I.B. was at a risk of falls due to nerve damage resulting from diabetes.

27

In light of the statutory language at issue, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### 2. N.J.

Momentum billed Medicare for two ambulance trips for this patient, both of which occurred on March 13, 2006. The ALJ determined that ambulance transport was not shown to be "medically necessary" for N.J., and denied the claims. The ALJ found that "the evidence demonstrated that [N.J.] could have sat in a wheelchair" and that she was not bed-confined. The ALJ noted the file did contain a physician statement indicating fall precautions should be taken, and that Momentum offered evidence that N.J. had sustained a pelvic fracture at some point. The ALJ pointed out, however, that Momentum's witness Mr. Bailey admitted during the hearing that he did not know when the pelvic fracture had occurred, and that the pelvic fracture history could have been "old information." Accordingly, the ALJ found that that the evidence in the record "did not substantiate the appellant's claims that other means of transportation, such as a wheelchair van, were contraindicated."

Momentum points to testimony from Nurse Adams that N.J. was hypotensive and at a risk of fainting, and that her low blood pressure required monitoring from the ambulance transport team. The run sheets admitted into evidence show that, although her blood pressure was taken, no other monitoring or services were administered by the ambulance team. Instead, the runs sheets show that the reason N.J. was transported by ambulance was "weakness" and the need for a two-man lift onto the stretcher. Although Momentum therefore argues that an ambulance transport was "medically necessary," the

examples of "medically necessary" situations listed in the Medicare Benefit Policy Manual make it clear that N.J.'s condition did not rise to this level of exigency. *See, e.g.,* MBPM § 20. In light of the statutory language at issue, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### 3. W.M.

Momentum billed Medicare for nine ambulance trips for this patient dating from June 19, 2006 through November 24, 2006. The ALJ first noted that W.M. was at a risk of falls or experienced weakness, but concluded that the evidence demonstrated W.M. "could sit in a wheelchair." Momentum's witness testified that she was usually in a wheelchair or in a reclining "Lazy Boy" chair when the ambulance crew arrived. The ALJ noted that the physician statement in the file stated that W.M. was not bed-confined and the statement was signed more than 60 days prior to two of the dates of service billed. Accordingly, the ALJ found that the evidence did not substantiate Momentum's claims that "other means of transportation were contraindicated."

Momentum contends that the ALJ's decision failed to take into account the fact that W.M. was 83 years old and suffered from end stage renal disease, Parkinson's disease and seizure disorder. Momentum also complains that the ALJ failed to consider Nurse Adams' testimony that W.M. was at a high risk of falls, and needed supervision and monitoring because of her debilitated condition. Finally, Momentum points to Mr. Bailey's testimony that W.M. was an obese woman who required two crew members to lift her onto the stretcher. Momentum contends that the ALJ failed to consider that W.M. satisfied the "medically required" prong of the general rule, where even patients who are

29

not bed-confined may still be transported by ambulance if it is "medically required." However, as discussed above, W.M.'s condition did not rise to the level of conditions listed in the MBPM. Accordingly, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### 4. L.P.

Momentum billed Medicare for one ambulance transport on January 29, 2007. The ALJ found this trip did not meet the Medicare guidelines. The ALJ noted that L.P. lived in a house and was either sitting in a wheelchair or on her bed when the ambulance crew arrived at her home. Accordingly, the ALJ found that the evidence did not substantiate Momentum's claims that "other means of transportation were contraindicated."

As with W.M., Momentum complains that the ALJ focused only on whether L.P. was bed-confined, and ignored evidence that ambulance transport was "medically necessary" in light of the fact that L.P. was 80 years old, suffered from congestive heart failure and diabetes mellitus, neuropathy and "general weakness due to cancer." Momentum complains that the ALJ also ignored testimony that L.P. needed constant monitoring due to her fragile state.

However, as discussed above, L.P.'s condition did not rise to the level of conditions listed in the MBPM. Accordingly, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### 5. E.P.

Momentum billed Medicare for two dates of service for E.P., submitting four line items for March 15, 2006 and two for June 23, 2006. The ALJ found that "the evidence demonstrated that the patient could have sat in a wheelchair." Specifically, the ALJ noted that E.P. wore a suit and sat on the couch when the ambulance crew arrived, and that he required help to rise from a sitting position but could pivot to transfer. Although there was evidence that E.P. suffered from an infection that warranted the use of isolation procedures, the ALJ noted "the ambulance run sheet does not document the use of isolation precautions." Accordingly, the ALJ found that the evidence did not support Momentum's claims that "other means of transportation were contraindicated."

Momentum points out E.P.'s infection, but does not point to any evidence showing that precautionary measures were, in fact, documented on the run sheets. Momentum also points to evidence that E.P. suffered from end-stage renal disease and congestive heart failure, peripheral vascular disease and hypertension. Momentum also contends that E.P. has "documented weakness from Parkinson's disease, which also more than likely affects his gait." However, this type of speculation cannot overcome the deference owed to the ALJ's findings. Accordingly, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### 6. S.P.

Momentum submitted four line items for two ambulance transports for S.P. on May 14, 2005. The ALJ found that none of these claims were payable, noting that the evidence showed S.P. could sit in a wheelchair and was not bed-confined. Although she

had oozing edema down her ankles and she was substantially overweight, Mr. Bailey testified that she was sitting at the door in her wheelchair when the ambulance crew arrived. Further, although there was evidence that she was oxygen-dependent, the run sheets at issue did not show that oxygen had been administered. Accordingly, the ALJ found that the evidence did not substantiate Momentum's claims that "other means of transportation, such as a wheelchair van, were contraindicated."

Momentum contends that the ALJ ignored or failed to properly consider evidence that S.P. was morbidly obese and that she suffered from chronic, open wounds from the oozing edema noted by the ALJ. Momentum also argues that S.P.'s diabetes caused her "epidermal integrity" to be "likely poor" and "pose[d] a significant risk of developing into septic wounds and ulcers." Momentum notes that S.P. suffered from a variety of conditions, including "'shortness of breath, hypertension, diabetes mellitus (which contributes to neuropathy, especially lower extremities and feet affected),' putting her at an 'extremely high risk for falls.'" Momentum also points out that Nurse Adams testified that S.P. was blind due to diabetes and that S.P. required constant monitoring due to blindness and depression. Momentum's argument is that "one would not want [S.P.] making decisions without assistance on dialysis days with her judgment being impaired by her depression."

In light of the authorities discussed above, and the guidance given by the MBPM, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### 7. A.R.

Momentum billed Medicare for seven dates of service for A.R., submitting 18 line items. The ALJ found that all of these were not payable by Medicare, again because "the evidence suggested that the patient could have sat in a wheelchair." Although Momentum submitted evidence that A.R. suffered from ulcers on her lower extremities, foot fractures and had a history of sepsis, the ALJ nonetheless noted that the evidence did not show A.R. had current fractures on the actual dates of transport. Further, the ALJ noted that A.R. was not bed-confined, but instead "was usually sitting in a reclining chair, like a dialysis chair, by her door at home, and wore braces on her ankles." The ALJ further observed that a physician certification statement on file for A.R. contained a notation that A.R. had "unstable" fractures, but that the notation "was not supported by Mr. Bailey's testimony that the beneficiary's condition had not changed since 2004." Accordingly, the ALJ found that the evidence did not substantiate Momentum's claims that "other means of transportation, such as a wheelchair van, were contraindicated."

Momentum contends the ALJ "ignored abundant evidence demonstrating that ambulance transportation was medically required" and points to evidence that A.R. suffered from "decubitus ulcers," was blind and diabetic, suffered from vascular disease and took Valium to control her "constant pain" and anxiety. Momentum points to Nurse Adam's testimony that "this blind, neuropathic beneficiary needed to be monitored for her safety during transportation by two medically trained personnel." Momentum also points to Nurse Adam's testimony that, in patients such as A.R., fractures may never heal. Momentum contends that this speculative testimony supplies enough evidence to

make the ALJ's finding that there was no evidence A.R. presently was suffering from fractures erroneous.  Momentum points out that Nurse Adams explained that she believed wheelchair van transport would be very painful for A.R., and that Ms. Rivera's multiple foot fractures would require two medical personnel to transport her to and from dialysis treatment.

Momentum also points to Mr. Bailey's testimony that ambulance transport was required for A.R. and similarly situated patients because the wheelchair van transports did not assist the patients with getting onto the van, and patients such as A.R. therefore could not get on to a wheelchair van.  Momentum does not, however, point to any evidence that A.R. could not sit in a wheelchair or that she was not bed-confined.

In light of the guidance given in the Medicare manuals and regulations, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### 8. D.R.

Momentum submitted four claims for five transports on three days.  The ALJ approved two of the dates of service for payment, but found that Momentum was not entitled to payment for the four claims it submitted for services rendered on March 7, 2006.  The ALJ noted that D.R. was an above the knee amputee who was 79 years old, and diagnosed with end-stage renal disease and unstable blood pressure.  The ALJ found that D.R. did require "professional transportation by ambulance and monitoring" but that Momentum had not produced a physician certification statement covering the March 7, 2006 transports.  Accordingly, the ALJ denied payment.

Momentum argues that the March 7, 2006 date was "close enough" in time to the March 21, 2006 and April 6, 2006 dates, which were covered by physician certification statements, to assume that the conditions that justified transport on those dates were present on March 7, 2006. Further, Momentum implies that it may have had a physician certification statement for D.R. on file but that it was lost by TriCenturion, TrailBlazer or Q2. Momentum also points to testimony by Nurse Adams that D.R.'s condition would have required constant monitoring and by Mr. Bailey that ambulance crews found D.R. in bed when they arrived and he had to be moved from bed to stretcher using a two-man lift. However, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### 9. C.R.

Momentum billed Medicare for ten line items for C.R., all of which the ALJ denied. The trips at issue took place between November 14, 2005 and February 16, 2007. The ALJ found that, although Momentum alleged C.R. suffered from weakness and difficulty ambulating, "the evidence indicates that the patient could have sat in a wheelchair as the beneficiary was not bed-confined." The ALJ noted Mr. Bailey's testimony that C.R. was sitting in a chair when ambulance crews arrived to pick him up, and that he was able "to pivot and ambulate a little." Accordingly, the ALJ found that the evidence did not substantiate Momentum's claims that "other means of transportation, such as a wheelchair van, were contraindicated."

Momentum contends that the ALJ "plainly ignored abundant evidence demonstrating that ambulance transportation was medically required," including that C.R.

was a blind, 80-year old patient with end-stage renal disease, and that C.R. "became cantankerous and difficult and refused to allow Momentum EMTs to take vital signs." Momentum describes this as "indicating problems with dementia related to his age and possibly to long term dialysis." Momentum also points to Nurse Adams' "uncontroverted" opinion that Mr. Ross would need to be monitored because of his "mental condition" that it contends he "likely" had. Nurse Adams' testimony was that C.R. was hypertensive, had a past stroke, documented complaints of chest pain, shortness of breath, and was on a pacemaker.

Momentum's speculation as to C.R.'s mental condition does not rise to evidence satisfying the guidelines at issue. Accordingly, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

**10. T.U.**

Momentum submitted claims for two transports, both on January 14, 2006. The ALJ found that all four line items submitted for these transports were not payable. The ALJ found that, although Momentum alleged T.U. could not walk due to shortness of breath, cardiomyopathy and severe edema, "the evidence suggested that the patient could have sat in a wheelchair." The ALJ pointed out that the run sheet stated T.U. "was assisted to stretcher" rather than lifted, indicating T.U. was capable of movement "under his own power" and the evidence did not substantiate Momentum's claims that "other means of transportation, such as a wheelchair van, were contraindicated."

Momentum contends that the ALJ "discounted abundant evidence demonstrating that ambulance transport was medically required," including that T.U. was 78 years old

36

and suffered from end-stage renal disease, cardiomyopathy, shortness of breath, severe edema and hypertension. Momentum also contends that run sheets submitted into evidence showed that T.U. "could not ambulate due to his shortness of breath and severe edema," and that T.U. was "at a risk for stroke or heart attack" particularly on dialysis days. Momentum also points to Nurse Adams' "uncontroverted" opinion that T.U required monitoring during transportation to and from dialysis.

However, in light of the authorities discussed above, and the guidance given by the MBPM, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### 11. D.W.

Momentum submitted four line items covering two trips, both made on August 16, 2005. The ALJ held that all four line items were not payable by Medicare because "the evidence demonstrated that the patient could have sat in a wheelchair." The ALJ noted that Mr. Bailey testified that D.W. was not bed-confined and sat on a couch or chair, and was able to pivot onto a stretcher. Accordingly, the ALJ found that the evidence did not substantiate Momentum's claims that "other means of transportation, such as a wheelchair van, were contraindicated."

Momentum contends the ALJ failed to account for evidence that D.W. had an enlarged heart and congestive heart failure, as well as hypertension, and was an elderly, 70-year old dialysis patient suffering from end-stage renal disease. Momentum points to Nurse Adams as "the lone health care expert" at the September 9, 2009 hearing, and to Nurse Adams' testimony that D.W. required monitoring during transportation to and

from dialysis.  Momentum contends that the ALJ also ignored evidence that D.W. lived in an assisted living facility that provided her "more intensive monitoring."

However, in light of the authorities discussed above, and the guidance given by the MBPM, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### 12. E.I.

Momentum submitted four line items covering two trips for E.I., both made on March 29, 2007.  The ALJ held that all four line items were not payable by Medicare because "the evidence demonstrated that the patient could have sat in a wheelchair" and that E.I. "was not bed-confined" but instead could walk and had "an unsteady gait." Accordingly, the ALJ found that the evidence did not substantiate Momentum's claims that "other means of transportation, such as a wheelchair van, were contraindicated."

Momentum points to evidence it contends establishes that ambulance service was "medically required" for E.I..  Namely, Momentum contends that E.I. was a 61-year old patient with end-stage renal disease and diabetes mellitus, hypertension and myocardial infarction, cataracts and a history of "3 bypass surgeries and bilateral amputation of his toes."  Additionally, Momentum contends the ALJ erred in requiring a particular form be on file as a physician certification statement.  Moment also contends that the ALJ's analysis of the facts regarding whether E.I.'s transport had a certification statement on the date in question was "garbled."

The statutes and regulations at issue are clear.  The patient at issue was not bed-confined and mere possession of a PCS, even if it were in the proper form, cannot suffice

to substitute for the requirement of medical necessity. Accordingly, the ALJ did not err in finding that the services at issue were not payable.

### 13. A.M.

Momentum billed a single line item for this patient, covering an ambulance transport on December 23, 2006. The ALJ acknowledged that A.M. had a history of seizures and was "at risk for falls," but concluded that "it appeared that the beneficiary could have sat in a wheelchair." The ALJ noted that A.M. lived in an apartment and was seated in a chair in her living room when ambulance crews arrived. The ALJ also noted Mr. Bailey's testimony that he never observed A.M. have a seizure.

The ALJ, noting that "a history of seizures does not preclude transportation in a wheelchair van," stated that the evidence did not substantiate Momentum's claims that "other means of transportation, such as a wheelchair van, were contraindicated." In light of the regulations and guidance given by the MBPM, the ALJ's finding is not in error.

### 14. J.R.

Momentum billed Medicare for two line items for J.R., both on December 27, 2006. The ALJ noted that J.R. "walked . . . to the back of the ambulance" but Momentum nonetheless transported J.R. to his home. Momentum contends that J.R.'s run sheet was submitted "without expectation of payment" and with a notation that that the ambulance service "was not necessary," but "the biller mistakenly billed for this service." Nonetheless, Momentum does not dispute that it did, in fact, receive a payment from Medicare for a service that did not meet the Medicare guidelines. Accordingly, the ALJ did not err by finding that Momentum should not have been paid for this service.

**15. N.P.**

For N.P., Momentum submitted two line items for a single day, September 26, 2005. N.P. was a 21-year old patient with end-stage renal disease. The ALJ noted evidence that N.P. was awake and alert during transport and there was no evidence that she was bed-confined or could not sit in a wheelchair. Accordingly, the ALJ found that evidence did not substantiate Momentum's claims that "other means of transportation, such as a wheelchair van, were contraindicated."

Momentum argues that it provided transport to N.P at the request of her physician and her social worker and that, "[i]n light of two health care workers believing that [N.P.] needed ambulance transportation to dialysis, Momentum should not be held liable pursuant to Section 1879."

Momentum's arguments, however, are directly contradicted by the statutory language and regulations at issue. In light of the authorities discussed above, and the guidance given by the MBPM, the Court finds that the ALJ did not err in reaching her determination as to this beneficiary.

### Momentum's Requested Offset

Finally, Momentum argues that it is entitled to an offset of between $ 400,000 and $ 600,000 for unpaid bills it submitted for services rendered to Medicare patients. Momentum did not advance this argument before the MAC. Accordingly, Momentum may not bring it in this Court. "Under ordinary principles of administrative law, a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency." *Gulf Restoration Network v. Salazar*, 683 F.3d 158,

174–175 (5th Cir. 2012) (quoting *Sims v. Apfel*, 530 U.S. 103, 114–15, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000)).

As with each of the foregoing grounds, summary judgment in Momentum's favor on this ground is not appropriate.

## CONCLUSION

A review of the record reveals that the ALJ applied the appropriate legal standards in making her determination. Additionally, substantial evidence supports the determination. A review of the pleadings, the discovery and disclosure materials on file, and any affidavits shows that there is no genuine issue as to any material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56(c). Accordingly, it is recommended that Momentum's Motion for Summary Judgment be **DENIED** and the DHHS's Cross-Motion for Summary Judgment be **GRANTED**.

**SIGNED** at **Houston, Texas** on **December** 18 , **2013.**

George C. Hanks

**GEORGE C. HANKS, JR.**
**UNITED STATES MAGISTRATE JUDGE**